WILLIAM DAGNER AND MARY D. DAGNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dagner v. Commissioner
Docket No. 7170-72.
United States Tax Court
T.C. Memo 1976-121; 1976 Tax Ct. Memo LEXIS 280; 35 T.C.M. (CCH) 551; T.C.M. (RIA) 760121; April 21, 1976, Filed James D. O'Connell, for the petitioners. Peter M. Ritteman, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under sections 6651(a) [1] and 6653(a) as follows: Addition to tax
Year
Income tax
Sec. 6651(a)
Sec. 6653(a)
1963
$ 3,157.01
$ 240.53
$ 157.85
1964
2,795.12
268.39
155.33
1965
1,631.56
65.32
103.08
1966
2,069.25
174.85
144.74
1967
1,293.69
76.38
136.54
1968
1,733.37
89.41
139.21
*281 Following concessions and adjustments by the parties, the only matters to be determined are the amount of petitioners' gross profit in each year from a grocery business and their liability for the asserted additions to tax. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners were husband and wife during the taxable years 1963 through 1968. They resided in New Boston, michigan, during those years and at the time the petition was filed. Their joint returns for the years 1963 through 1968 were filed with either the district director of internal revenue in Detroit, Michigan, or the central service center in Covington, Kentucky. During the years in issue, William Dgner (hereinafter sometimes referred to as petitioner) was employed as a roller at the Detroit Steel Corporation and Mary D. Dagner as a nurse by the State of Michigan. During 1963, 1964, and part of 1965, they also operated two grocery stores outside of Detroit. Some time in 1965 one of the stores was *282 closed, but petitioners continued to operate the other through the end of 1968. They reported net losses from the grocery business on their tax returns for each of the years in issue. Petitioners maintained books and records consisting of cancelled checks, purchase invoices, and single entry journals or daybooks in which merchandise purchases and daily cash register balances were recorded. Purchases were entered in the daybooks by petitioners or by the employees who ran the stores in their absence. William Dagner computed and entered the daily receipts by subtracting the amount of cash in the register at the opening of business from the amount it contained at the end of the day. The sum of these daily receipts figures for the year was the amount reported as gross sales on petitioners' returns. Some merchandise was purchased with cash from the register but no adjustment to the daily receipts was made therefor. Petitioners had gross merchandise purchases as follows: Gross Merchandise Purchases
1963
1964
1965
Beer
$ 18,237.08
$ 18,847.93
$ 23,778.60
Bread
10,504.34
16,029.87
16,319.84
Tobacco and
15,486.19 [1]
candy
Dairy
33,185.31
33,999.17
30,344.28
Meat
10, 633.26
19,883.21
17,539.08
Pop
10,677.65
17,641.72
16,397.34
Wine
630.70
563.95
717.13
Produce
3,442.16
3,928.80
4,866.20
Groceries
17,144.04
40,958.11
45,394.05
Unidentified
23,822.73
4,415.74
2,802.75
*283 Gross Merchandise Purchases
1966
1967
1968
Beer
$ 24,470.51
$ 26,286.38
$ 26,074.48
Bread
12,438.51
9,792.69
8,957.27
Tobacco and
candy
Dairy
25,832.25
25,435.89
27,002.22
Meat
12,228.96
10,590.95
10,595.56
Pop
10,238.79
12,873.01 10,938.02
Wine
2,455.55
101.25
1,035.93
Produce
3,579.20
2, 862.19
2,734.20
Groceries
34,086.29
29,277.31
30,265.55
Unidentified
428.66
11.78
Petitioners employed the following percentage markups on their merchandise inventory: Percentage
1963
1964-1968
Beer
20
20
Bread
15
15 [1]
Tobacco and candy
18
Dairy
8
8
Meat
12
12
Pop
20
20
Wine
20
20
Produce
10
10
Groceries
20
19
The total cost of merchandise sold by petitioners in each year was as follows: Year
Cost
1963
$ 137,715.40
1964
149,187.02
1965
150,944.79
1966
120,052.47
1967
113,267.24
1968
112,386.00
The overall average markup weighted according to each category purchased in the year in question was as follows: Year
Percentage
1963
15.0
1964
15.2
1965
15.6
1966
15.7
1967
15.8
1968
15.7
*284 Petitioners' gross sales (after applying the foregoing average markup and adding 4 percent sales tax), sales returns, cost of goods sold, merchandising expense, and gross profit in respect of their grocery business were as follows: Merchan-
Gross
Sales [1]
Cost of
dising
Gross
Year
sales
returns
goods sold
expense
profit
1963
$ 164,707.62
$ 137,715.40
$ 805.44
$ 26,186.78
1964
178,737.99
$ 2,163.18
149,187.02
1,282.22
26,105.57
1965
181,471.87
2,560.32
150,944.79
7,820.58
20,14 6.18
1966
144,456.74
2,111.20
120,052.47
6,812.29
15,480.78
1967
136,410.00
2,054.30
113,267.24
8,013.61
13,074.85
1968
135,231.82
1,947.02
112,386.00
8,366.20
12,532.60
Petitioners' business expenses in respect of their grocery business were as follows: Year
Expenses
1963
$ 22,693.98
1964
24,765.32
1965
19,408.21
1966
15,654.81
1967
13,720.26
1968
13,816.31
The amount petitioners reported as taxable income, the *285 amount respondent determined to be their taxable income in the notice of deficiency, and their actual taxable income in each year were as follows: Year
Return
Deficiency notice
Actual
1963
None
$ 13,456.70
$ 14,721.88
1964
$ 1,917.71
14,542.75
13,506.55
1965
2,875.13
11,098.07
11,298.48
1966
5,084.19
14,539.46
12,982.26
1967
8,259.67
13,883.29
12,912.06
1968
5,881.22
13,319.49
12,549.98
Petitioners' returns for the years in issue were filed on the following dates: Year
Date
1963
October 4, 1965
1964
October 29, 1965
1965
May 26, 1967
1966
August 1, 1969
1967
August 1, 1969
1968
August 1, 1969
ULTIMATE FINDINGS OF FACT 1. At least part of the deficiency in each of the years 1963 through 1968 is due to negligence on the part of petitioners. 2. Petitioners filed their Federal income tax returns for the years 1963 through 1968 untimely without reasonable cause. OPINION 1. Deficiencies
In his notice of deficiency, respondent accepted as correct the amount of gross sales reported by petitioners on their returns but determined that they overstated their purchases. He redetermined the amount *286 of purchases by computing an average percentage markup and discounting gross sales accordingly. Following petitioners' belated production of substantiating records, the parties have stipulated the amounts of petitioners' gross purchases.Respondent now contends that gross sales were understated due to the failure to account for cash purchases paid for out of daily receipts before those receipts were counted. [2] In recomputing gross sales, he again determined percentage markup figures and applied them to the stipulated purchases. The percentage markups used were based upon petitioner's testimony. [3]
Petitioner testified to percentage markups on bread, beer, pop, and wine which respondent accepts without qualification. He stated that the markup on tobacco and candy was about 18 percent, while on groceries in general it was 20 percent. Tor years in which tobacco and candy purchases *287 were included in "groceries," respondent used an overall figure of 19 percent. Petitioner also testified that the markup on milk was 5 percent, while on other dairy products it was 12 to 15 percent. Since all dairy purchases were recorded together, respondent applied an overall markup of 8 percent. [4] We find these figures to be reasonable; indeed, respondent has given petitioners the benefit of the doubt. Finally, petitioner testified to a percentage markup of 10 to 12 percent on produce. Respondent adopted the 12-percent figure. We believe that 10 percent is more consistent with the record and have found accordingly. Although we are generally in agreement with respondent on the percentage markups used by petitioners, we disagree with the way he used those markups to arrive at gross sales. In applying the percentages to gross purchases, respondent clearly erred. In order to determine the amount actually received from sales, the percentage markup must logically be applied to cost of goods sold during the taxable year, not to the cost of purchases. Otherwise *288 petitioners could be charged with receipt of income amounting to as much as 120 percent of the cost of goods sold.[5] Application of a percentage markup to cost of goods sold is a well recognized method of income reconstruction where, as here, the taxpayers' books do not reflect their true income. See , affg. ; , affg. . Respondent did, of course, compute petitioners' total cost of goods sold for the purpose of determining their gross profit. His computation is based on stipulated or uncontradicted evidence, and accordingly we adopt his figures. Since the record does not reveal a breakdown of the total cost of goods sold among types of inventory items, we have determined that petitioners' gross sales should be calculated by applying an average markup to total cost of goods sold. The average markup for each year is the average of the markups used for different *289 categories of merchandise, weighted according to the amount of each category purchased in the year in question. Cf. , affg. . Application of these percentages to petitioners' cost of goods sold produces a gross sales figure which, in conjunction with the business and personal deductions [6] agreed upon or conceded by the parties and the 3 percent of adjusted gross income limitation on deduction of medical expenses (section 213(a)), produces the taxable income figures shown in our findings of fact. The deficiency to which respondent is entitled for each year is to be determined as the tax on such figure or on the taxable income shown in the notice of deficiency, whichever is less, since respondent has made no claim for increased deficiencies. See p. 7, supra.
*290 2. Negligence
Petitioners omitted large amounts of gross income in each of the years before us, resulting in an underpayment of tax. They failed to maintain books and records adequate to show their correct taxable income; in fact, their bookkeeping method was conducive to error. Further, they have not separately contended nor introduced any evidence to carry their burden of proof that respondent's imposition of the section 6653(a) addition to tax for negligence is erroneous. Respondent's action is sustained. ; .
3. Untimely Filing
Petitioners' returns were filed later than the last day prescribed by law for filing. No excuse or even an explanation has been offered. The addition to tax for late filing under section 6651(a) is sustained. . Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
1. Included in groceries after 1963.↩
1. Included in groceries.↩
1. As reflected on petitioners' tax returns and not otherwise in dispute or as computed by respondent to the extent that respondent's figures are more favorable to petitioners.↩
2. Such a practice would result in a double reduction in income, since all purchases were recorded and added to cost of goods sold. ↩
3. Respondent applied an average markup of 15.8 percent to unidentified purchases. Petitioners have not favored us with a brief disputing any of respondent's figures.↩
4. Petitioners stated in an interview with a revenue agent that their markup on dairy products was 10 percent.↩
5. See ; .↩
6. The gross sales figure includes an addition of 4 percent for the sales tax on all sales, both reported and unreported. Petitioners claimed and have been allowed a deduction for the sales tax on the reported sales.As to the unreported sales, we think it reasonable to infer that petitioners collected the sales tax but obviously no offsetting deduction is allowable in the absence of evidence of payment.↩